YARD'S EXECUTOR and another *vs.* YARD and others.

Conveyances set aside, on the ground that at the time of their execution the grantor was in such condition as to subject him to the influence of those in whose favor they were made, to such an extent as to deprive him of his free agency, and that the deeds were not those of the grantor, but of the grantees.

---

Bill for relief. On final hearing on pleadings and proofs.

*Mr. G. D. W. Vroom* and *Mr. J. Wilson,* for complainants.

*Mr. E. L. Campbell,* for defendants.

THE CHANCELLOR.

Joseph Yard, late of Trenton, died on the 13th of May, 1872. He was never married. He had a son, William M. Yard, who is one of the complainants. He had two brothers, Jethro and Archibald W., and a sister Ann. He, and Jethro and Ann, who were both unmarried, lived together. Jethro, (who was a quiet, nervous, eccentric man, of no force of character, and probably of no business qualifications,) and he were in business together as partners in the manufacture of soap. Joseph Yard's property consisted of an undivided half of the soap-house property, which was situated in Broad street, in Trenton, and was owned by him and Jethro as tenants in common, and was subject to a mortgage of $1500; his interest in the stock and fixtures of the soap factory, and the debts due the firm, which were of no considerable amount, and the property, a house and lot in Lamberton street, in Trenton, on which he lived. He was a man of intelligence and of considerable self culture. In his opinions he was positive, and in his disposition, decided. His brother Archibald says, "his way of doing business was to say he wanted it done, and when he wanted anything done, he wanted it done right away." He was very loquacious; "all he wanted," says one of the witnesses, "was a good listener." He was decided in his likes and dislikes. He was, says Dr. Coleman, a good hater, but only from cause. He was of impetuous temper, but quickly came to himself, and was ready to make amends. For some years before his death he had been afflicted with an organic disease. His feebleness was increased by a severe injury received by him in September, 1871, in falling down the stairs of his house. From that time till his death he appears to have done no work. On the 12th of April, 1869, he executed his will, by which he devised and bequeathed all of his estate to his executor, the complainant Randolph Moore, in trust, for the

use of his brother and sister, Jethro and Ann, and the survivor of them for life, and after their death to his son, the complainant, William M. Yard, with provision that in case of the death of his son before them, or the survivor of them, the estate should go to them, or to the survivor of them. When he made this will he was, as is admitted by the answer, in good health and of unimpaired mental faculties. Between him and his son there was a sincere attachment, which continued to the end of his life. On the other hand, his brother Archibald and his sister not only regarded his son with disfavor, but in their conduct towards him evinced positive dislike, and treated him with contempt, and even with harshness, when he came to the house to see his father in his severe illness. When the testator went to make his will, he said to his son, "I am going to make my will; I want to recognize you, my son." In his will he speaks of him accordingly as his "son, William M. Yard, born of Abjail Curry." William served him in his business, receiving no compensation except his support, and a trifling sum of pocket money from time to time, but having the assurance from his father that he would succeed to his interest and property, and he appears to have served accordingly, managing the business during the testator's illness down to the time when Archibald W. Yard took possession of the soap-house property, a few days before the testator's death.

In the testator's last illness he was attended up to the 8th or 9th of May, and, therefore, within four or five days of his death, by Dr. James B. Coleman. In 1871, and up to August of that year, he had had for his physician, Dr. J. I. B. Ribble, but being dissatisfied with him at that time, he had discharged him. Dr. Ribble says he was not formally discharged, but the evidence shows clearly that he was in fact discharged, and so understood it. William M. Yard says that his father was sick with erysipelas before his fall in 1871; that he then became dissatisfied with Dr. Ribble, and wished him, William, to go and pay Dr. Ribble off; that the testator "wanted to get clear of him." William expressing

reluctance to do the errand because of its unpleasant character, suggested that the testator send John Hopping. Hopping corroborates William on this point. He says that he went to see Dr. Ribble at one time, and paid him a bill, and that the testator told him William would not go for him. Dr. Ribble says that the testator sent the money by Hopping on the 12th of August, 1871, and that he never attended the testator after that, until a few days before his death.

On the 20th of April, 1872, twenty-three days before his death, the testator, with Jethro, conveyed to Archibald Yard the soap-house property, with the utensils and fixtures, for the consideration of $7000, of which $1500 were paid in money, and $4000 were secured by a mortgage on the property, made in favor of Jethro and Ann. There was, as before stated, a mortgage for $1500 on the property at the time of the conveyance, and the amount of this was computed as part of the purchase money. On the same day, he executed a deed to Jethro and Ann for the nominal consideration of $1, for his dwelling-house and lot, for their lives, and the life of the survivor of them. On the 3d day of May following, Jethro and Ann re-conveyed the property to the testator, and three days afterwards he conveyed the premises to them in fee. By these conveyances, (for the conveyance to Archibald included the soap-house fixtures,) he disposed of all his property. After his death his will was admitted to probate, and the complainants, the executor and William M. Yard, filed their bill in this cause to set aside the conveyance by the testator to Archibald, and the last-mentioned conveyance to Jethro and Ann, on the ground that they were fraudulently obtained. Their allegation is, that at the time when they were made, the testator was mentally incompetent to make them, and that they were procured through undue influence. The testator was then grievously afflicted with a mortal illness. He was of advanced years, having passed the ordinary limit of human life. His memory was so defective that, on the 27th day of April, he had no recollection whatever of the conveyance to Jethro and Ann, which he had executed

but seven days before; nor had he any recollection whatever of the' transaction. His appearance had, before that time, changed most noticeably. He no longer took notice of his acquaintances. He was silent, and his look was vacant. He was a mere wreck of his former self.

The evidence is, that, in the conveyance to Archibald, the latter was the chief actor. He applied to Randolph H. Moore in the month of March, 1872, to draw a deed from Jethro and the testator to him for the soap-house property, conveying it for the consideration of $7000, or $5500 over the mortgage upon it, and to draw a mortgage, to be executed by him and his wife, to the testator and Jethro, for $4000 of the purchase money. The papers were drawn; but, between that time and the 1st of April, he informed Mr. Moore that the testator and Jethro had refused to make the conveyance.' On the 20th of April he again applied to Mr. Moore, and requested him to prepare the papers, in order that they might be executed immediately, and directed him to draw the mortgage for $4000 in favor of Jethro and Ann, instead of the testator and Jethro. The papers which had been drawn on the former application, had not been destroyed. Mr. Moore altered the mortgage to conform to the directions of Archibald, and went, on that day, to the house of the testator, to which the latter was confined by illness, and they were then and there executed. Mr. Moore testifies, that, when he entered the house, the testator saw him, and raised his hand and said, " a pen; " that he, Moore, then said, " Mr. Yard, I want to read the papers to you before you execute them; " that he then took the papers from his pocket and read them to him; that he was very particular in reading and explaining them to him; that the testator said " yes " and " no," and talked very little, if any; that the testator signed the deed, as did Jethro also; that Mr. Moore felt satisfied that the testator was a very sick man, and he commenced a conversation with the testator, and tried to talk with him, but the testator seemed exhausted and vacant, and appeared to have such a singular look that he did not seem natural. Mr. Moore says he was struck with it at the moment, and it

immediately occurred to him that the testator was not fit to do the business he had transacted with him, and he felt very unpleasantly about it.    It appears that Mr. Moore communicated to Archibald, on his way to the testator's house, on that occasion, the fact that the testator had made a will.    On the same day, and about an hour after Mr. Moore had returned to his office from the house of the testator, which he left soon after the deed was executed, Archibald came to Mr. Moore's office and requested him to draw a deed from the testator to Jethro and Ann, for the testator's homestead property.    Mr. Moore refused, on the ground that the testator was not, in his opinion, in a fit condition to execute any paper. The following week Archibald went to Mr. Moore and told him the testator wanted his will.    Mr. Moore told him he would go to the testator's house and take the will with him. Shortly afterwards, Jethro came with the like request, and, according to Mr. Moore's impression, said the testator wanted the will, to destroy or cancel it.    He received a similar reply to that which had been given to Archibald.    On the 27th of April, Archibald employed a lawyer, Mr. Isaac W. Lanning, to get the will from Mr. Moore.    Mr. Lanning made a written demand for it on Mr. Moore, but the latter declined, as before, to give it up.    On the 8th of May Mr. Moore went to the testator's house, in company with Dr. Coleman, taking the will with him.    He took Dr. Coleman with him in order that he might have the benefit of the opinion of a person competent to judge as to the testator's mental capacity.    At the interview which he and Dr. Coleman then had with the testator, Jethro and Ann were present.    The testator was lying on the bed in the same room in which the deed was executed.    Mr. Moore then reminded the testator that he had prepared the will for him, and that the testator had given it to him to keep for him, and then said, " by this will you have given to Jethro and Ann all your property, both real and personal, during their natural lives, and at their death it is to go to William M. Yard—what do you want me to do with this will?"    The testator, in a broken voice, replied, "keep it."

Late in the afternoon of the same day on which Mr. Moore refused to draw the deed to Jethro and Ann, Archibald employed Judge Reed to draw it. He told Judge Reed that the testator was sick, and desired to make some disposition of his property in Lamberton street, so as to provide for his brother and sister, Jethro and Ann, during their lives; that he wanted the property to go to them for their lives, and then to his heirs, and that he wanted the deed drawn at once. Judge Reed drew the deed and went with it to Archibald's house, according to appointment. While there, Archibald's wife told him that the testator was weak; that it was very difficult and painful for him to converse, and, therefore, he talked but very seldom, and only when it was absolutely necessary, but his mind was clear, and he understood everything as well as ever. Judge Reed accordingly went to the testator's house with Archibald, and witnessed the execution of the deed and took the acknowledgment. The testator, in the interview which Judge Reed had with him on that occasion, did not articulate a single word. When Judge Reed, after explaining the paper to him, asked him if he desired to sign it, he said nothing, but "half nodded and made a noise as of assent." He was raised up in the bed by Ann and Archibald, and, with a great deal of difficulty, signed the deed. To the usual question put to him to obtain his acknowledgment, he assented, in like manner, by an inarticulate sound, but said not a word. Judge Reed says that, at that time, he knew nothing of the testator's mental condition, and that as to his making no articulate demonstration, he relied on what Archibald's wife told him in reference to the testator, as a sufficient explanation. When Mr. Lanning, on the 27th of April, went to see the testator in regard to obtaining the will from Mr. Moore, he found him lying in bed. Jethro and Ann, and Archibald and his wife, were all there. Mr. Lanning says: "After I went in, I spoke to Mr. Joseph Yard, and had some conversation with him in the presence of the other persons, or some of them; and after a few moments' conversation with Mr. Joseph Yard, I re-

quested the other persons to leave the room, saying to them that I wished to have a private conversation with Mr. Joseph Yard; they then passed into the adjoining room, and I closed the door myself, between the two rooms; I then spoke to Mr. Joseph Yard about his having sold his property on Broad street, called the soap-house property; I told him I had heard that he had sold that, and he replied that he had; I then asked him in reference to the deed to his brother Jethro and his sister Ann, for the Lamberton street property, and whether he had made a deed to them of that property; he replied that he had no knowledge or recollection of that; I then asked him if he did not remember Judge Reed having been there with a deed, which he signed and acknowledged in the presence of Judge Reed; he said he had no recollection of it; he said he had no recollection of Judge Reed having been there, or of his having signed any paper in his presence; I then asked him if he had made a will; he said that he had; I asked him who had it; he replied, 'Randolph Moore;' I then put this question to him, 'Mr. Yard, in that will, did you make any provision for your son William?' he answered, 'yes;' I then asked him this question, 'Mr. Yard, do you wish William to have any of your property?' he said, 'yes, I do;' I then put this question to him, 'Mr. Yard, have you meant or intended to make any deed, or do anything which will deprive William of any interest or advantage which he might derive from your property under that will?' he answered, 'no, sir, I have not;' I then asked him, 'do you wish to have that will delivered to you or any other person?' he answered, 'I don't;' I then said to him, 'Mr. Yard, do I understand you to say that you wish that will to remain as it is, and that Mr. Moore shall hold it?' he answered, 'yes, sir;' I then cautioned him against signing any paper unless under legal advice. I then stepped out of the room and had a conversation with Mr. Archibald W. Yard, and told him (Archibald) that Joseph had no recollection of the deed drawn by Judge Reed—that he did not appear to remember anything about it; Archibald then stepped into the

room where Joseph was lying, went to the bed-side of Joseph, and asked him this question, 'Joseph, don't you remember signing a deed last Saturday, when Judge Reed was here?' Joseph answered, 'I do not;' Archibald then said to him, 'don't you remember his having a paper for you to sign, and that you signed it?' and Joseph answered him, 'no, I don't;' Archibald then addressed himself to me, and said, 'he doesn't appear to remember it.' I then said to Archibald that the property ought to be re-conveyed by Ann and Jethro to Joseph, as I considered his deed to them to be invalid and worthless, and that after so re-conveying the property to Joseph, let every thing remain until Joseph recovered from his illness and his mind became fit for the transaction of business; as I was then about leaving the house, I said to Joseph, in the presence of the other parties, or some of them, that I would call and see him at any time he might desire an interview with me, and I then left the house. On the 3d of May following, Mr. Archibald W. Yard called at my office and produced the deed drawn by Judge Reed; it was the deed from Joseph to Ann and Jethro Yard; he stated to me that he borrowed the deed from the county clerk; he left that deed with me, for me to draw a deed of re-conveyance of that property by Ann and Jethro Yard to Joseph Yard; he said he had been to Mr. Richey's office; that Mr. Richey was sick that morning, and he had there been referred to me as having some knowledge of the matter; I promised to draw the deed re-conveying the property from Ann and Jethro to Joseph, and would see them at the house at two o'clock in the afternoon; I drew it, and took it with the other deed—the deed drawn by Judge Reed—to the house, at the hour named, and Ann and Jethro executed it in my presence; I took their acknowledgment, and then had both deeds in my hand, and took both deeds to the clerk's office for record; the first deed had been entered in the clerk's office, but had not been actually recorded; some one asked me how much was to be paid for drawing the deed; I replied that my charges in this case would be $1.50; that the new deed required a revenue stamp

of fifty cents, which would make $2.00 ; Joseph then put his hand in his pocket and took out some money ; the sum of $2.00 was again named ; Ann and Jethro were there ; Ann passed across the room from where Joseph was sitting, and as she handed me the money—two bank bills—she remarked, that he (Joseph) doesn't appear much like a man whose mind is not fit for business, from the way he counts money ; as she placed the bills in my hand, I saw that one of them was a $5.00 bill, and I said to her, here are $6.00 instead of $2.00, and then Ann and Jethro, between them, corrected the amount."

Three days after the re-conveyance to the testator had been thus made, the testator made another deed, as before mentioned, conveying the property to Jethro and Ann in fee simple. This deed was drawn by Mr. George W. Smythe, a counsellor-at-law, who was employed for the purpose by Archibald's wife. Archibald was present when that deed was signed, and so were Ann and Jethro. Archibald's wife gave Mr. Smythe instructions in reference to the deed, and requested him to go to the testator's house and see him on the subject. Mr. Smythe testifies that he went there and found him lying on the bed. He stated to the testator what Archibald's wife had told him, and he says that the testator assented to the correctness of the statements ; that he then drew the deed, and went to Dr. Ribble's office and asked him to go with him to witness the execution of the deed. Dr. Ribble went with him, and the deed was executed by the testator, both of them signing it as witnesses. When asked as to his reason for requesting Dr. Ribble to witness the execution of the deed with him, Mr Smythe says : " I don't remember now the exact reason which weighed on my mind, why I had it signed by two witnesses ; I think it occurred to me that Mr. Yard was old and sick, and Mr. Lanning said the deed ought not to be written ; I thought it would be very proper to call on Dr. Ribble, who, as I understood, was then the attending physician of Mr. Yard, and ask him to go down with me to see Joseph Yard and attest the execution of the deed ; I knew that Dr. Ribble was his physician, because I think Mrs. Yard told me so that morn-

ing; it is my impression that she told me Dr. Coleman had been his physician, and that he had discharged him and employed Dr. Ribble; I went after Dr. Ribble about three o'clock, and asked him to go down with me and see Mr. Yard and be the attesting witness to the deed, and he consented to do so; I don't remember whether Dr. Ribble said, at that time, that he was Joseph Yard's physician; I only asked him to go with me to witness the deed." Dr. Ribble, it may be observed, swears that he suggested to the testator that Jethro and Ann should re-convey the homestead property to the testator, in order that the latter might convey it to them in fee simple; but it is entirely clear that the re-conveyance was the result of Mr. Lanning's advice and not of Dr. Ribble's suggestion. Dr. Ribble appears to have taken much interest in the disposition of the testator's property. He, as before stated, had been discharged by the testator in 1871. He says he was re-employed by the testator very shortly before his death. His re-introduction to the testator, as his physician, was through the instrumentality of Archibald W. Yard. He, after the testator had been pronounced by Dr. Coleman incapable of transacting business, employed Dr. Ribble to visit the testator with a view, as they say, of forming a judgment as to his mental capacity. This visit, Dr. Ribble says, was in the latter part of April. It must have been after the 20th, for it was after the deed to Archibald had been executed. It was, therefore, at the earliest, within about three weeks of the time of the testator's death. He says, as the result of his examination, that he found the testator's mind entirely sound, his memory as good as it ever was, his reasoning faculties in good condition, his speech connected, his temper cheerful, his humor jocose, and he says there was nothing unusual in his manner or appearance, or expression of countenance. He immediately reported the result of his investigation to Archibald. His next visit, he alleges, was due to accident. He then went to the testator's house, not to see him, but to see Archibald's wife, who was under his medical care. On going to her house he found, he says, that she was not at home, but had gone to the testa-

tor's house. He followed her there, and there had another interview with the testator. In this interview, he says, the latter said he had conveyed his homestead property, by deed, to Jethro and Ann for life, and asked his advice as to how he could best convey the property to them in fee. Dr. Ribble says he advised him to do it by deed, "as deeds were less likely to be contested than wills." The unusual character of this professional visit—the physician following up his patient without any reason for doing so, connected with her state of health; the suggestion which Dr. Ribble says he made as to the comparative liability of the conveyance to be "contested," and the fact that he says he advised the re-conveyance by Jethro and Ann to the testator, whereas that re-conveyance was, undoubtedly, the result of the advice of Mr. Lanning; and the fact that he was called by Mr. Smythe to sign, as a witness, the deed to Jethro and Ann, in fee simple, are worthy of remark. That he was re-introduced to the testator by Archibald, with a view to the establishment of the conveyance to him, and to the execution and establishment of that which he proposed that the testator should execute in favor of Ann and Jethro, is manifest.

Dr. Ribble's description of the testator's appearance and condition, is at variance with the proof in the cause. Dr. James B. Coleman, who is a disinterested witness, testifies that he noticed a marked change in the testator in April, 1870; that he then began to grow weak-minded and incapable of transacting any but routine business; that on the 12th of April, 1872, and from that time to the 8th of May following, he visited him as his attending physician constantly, daily, and sometimes twice a day, and, during the whole time, he was suffering from softening of the brain and general breaking down of his system, and was entirely unfit for business—incapable of doing anything that required any operation of the mind, and incapable of connecting antecedents with their consequents. He says that when he visited him on the 8th of May, he was in a dull, stultified condition, his mind sluggish and obtuse, and entirely different from what he was when

he was himself. Dr. Skelton, who was an old acquaintance of the testator, testifies that he last saw him six weeks or two months before his death; that his perceptive faculties were very much impaired, and he considered his mind was very much impaired; that he noticed a very decided change in his intellectual powers and in his judgment; and that his disease was softening of the brain. Mr. Moore, on the 20th of April, found him very sick. He says he seemed vacant and exhausted, and looked vacant and wild; that he appeared to him to have such a singular look that he did not seem natural, and Mr. Moore was immediately impressed with his incapacity to do the business which he had transacted with him—the execution of the deed to Archibald for the soap-house property; that the testator, in rising from the bed to sign that deed, was assisted by Ann, and that immediately after he had signed it he lay down again, and seemed to be exhausted. Mr. Moore says that it is his impression, that when Archibald came to him to get him to attend to that business, Archibald told him that the testator was confined to the house, and was not able to get out. He testifies that on the day on which Dr. Coleman and he went to see the testator together, (which Dr. Coleman says was on the 8th of May,) the testator did not speak to any one but very little, and that he only spoke when spoken to, and then with difficulty. Judge Reed says, that on the 20th of April, when he went to the testator's house to witness the execution of the deed he had drawn at Archibald's request, in favor of Jethro and Ann, the testator was in bed, and that in the whole interview the testator did not speak a word, but made an inarticulate noise. Samuel Mellor saw the testator two or three weeks before he died, and, on that occasion, which was a visit of two hours, the testator said nothing he could understand. He says that he could not speak, and kept muttering something that the witness could not understand, and that during all the time he and his wife were in the house, on that visit, neither of them could hold any conversation with him. He says that before the testator was confined to his bed,

he saw him in the alley which led from the testator's dwell-ing-house to the soap-house, and though he spoke to him, the testator did not recognize him, but stared at him; and when William, who was with the testator, informed him who Mr. Mellor was, the testator muttered or said something which Mr. Mellor could not understand. Mrs. Mellor says that, on the occasion of the visit by her and her husband to the testator, she took hold of the testator's hand, and he looked at her and made a noise, but she could not understand what he said or tried to say. Dr. Waldburg Coleman was called to attend the testator on the occasion of his fall, in the autumn of 1871. He says he answered his questions as if his mind was disturbed; that his answers were very slow, and he thought his mind was a good deal disturbed; that his disordered mental condition was more than could be accounted for by the bruises he had received, and that he thought he was childish. Mr. Slack, an old acquaintance of the testator and a pall-bearer at his funeral, says that the testator appeared to be very much broken up from the effect of the fall; that after the fall he noticed a very perceptible change in him; that his memory appeared to have failed, and his mind was weak, and, to a great extent, gone, and that he would talk very little, and "would sometimes commence in the usual way, and that what he wanted to say would slip from him," and that his loss of mind was very perceptible. To the same effect is the testimony of William M. Yard. He says, speaking of the testator's condition after the fall, that he has seen him often forget what he attempted to talk about; that there was a great change in his conversational powers; that he became stupid and childish, and his eyes would glare, and that between the 12th of April and the 12th of May, he held no conversation with anybody. John Miller, the barber, says that after the fall, the testator came to his shop to get shaved, generally three times a week; that his son William or one of his men came with him; that he always had some-body with him; that he looked as if he had had a stroke of paralysis; that he was changed in the face; that he did not

appear to have anything to say to anybody; that sometimes men in the shop who knew him, would speak to him, and he would not answer; that he "kind of murmured;" that they used to have to lift him into the barber's chair and out again, and that when he paid for his shaving, he handed the money to his son, that he might pay for him, as if he did not know the difference in the pieces of money. And the witness says the testator did not know the difference. He says that before the fall, he always talked to his old friends—to him, Mr. Hutchinson, Mr. Carlyle, and others—but after the fall he did not. John Birt, who was an old acquaintance of the testator, and saw him frequently, says he noticed a decided change in him while as yet he came to the soap-house. He appeared to him to be becoming more childish. Mr. Alexander H. Rickey was accustomed to see the testator at the soap-house, for two or three years before his death. He says that before his death he perceived that he was failing in health and thought, and seemed to be getting feeble, and that on one occasion when he saw him there, at about ten o'clock in the morning, the testator did not talk at all, and did not recognize him at first, when the witness spoke to him, though he did afterwards. He adds that the testator grew worse after that. Mrs. Aitken, a witness called for the defendants, says that about two weeks before the testator died, she went to see him, and that she thought he was too low to talk with him. Judge Scudder, who from his boyhood had known the testator, testifies that the last time he saw him was, as nearly as he can recollect, about three or four months before his death; that he then met the testator and his son in the street, in Trenton; that William spoke to his father, and said to him, " father, this is Judge Scudder;" that he raised his eyes and looked at the judge, but Judge Scudder doubts whether he recognized him; and he says that if he did, he showed no inclination to speak or converse with him, and that when he was well he always spoke to him on the street, and it was difficult to get away from him, he was "such a talker." He says his countenance was very much changed, particularly his eyes and checks; ·

they were very much altered, and he walked slowly and with much difficulty, and that he was a wreck of what he had been. ' Dr. Ribble himself says that the testator died from exhaustion from chronic Bright's disease; that he first visited him, professionally, in his last sickness, on the 6th of May; that from that time to the time of his death, which occurred seven days afterwards, he visited him very frequently—sometimes four, five, and six times a day, sometimes three, very rarely less than twice a day; that he visited him so often because he was very sick, and that he visited him from two to six times a day, at least, professionally. The evidence which this statement affords of the condition of the testator, of itself casts grave doubt, to say the least of it, upon the accuracy of the testimony of Dr. Ribble in regard to the testator's condition when he visited him at the request of Archibald W. Yard. It is by no means likely that a person of the advanced age of the testator, suffering under the disease with which he was afflicted, to such an extent as to require from two to six visits a day from his attending physician, would, two weeks before that time, have been not only cheerful, but mirthful and jocular, telling amusing stories himself, and laughing at them, and relishing the jokes of others. Yet, Dr. Ribble says this was the testator's condition at that time. The like considerations apply to the testimony of those witnesses on the part of the defendants who speak of the testator's habits and actions 'in the last days of his life; of his skill in card playing, of his novel reading, and smoking and jesting.

The testimony leads me to the conclusion that at the time when the deeds in question were made, the testator was of feeble mind; that he was constantly subjected to the influence of his brothers and sister, who exercised it in their own favor, and were actuated by a double purpose to obtain his property for themselves, and to prevent the testator's son from getting any part of it. The deeds were not the deeds of the testator, but of those by whom he was surrounded. His condition was such as to subject him

to their influence to such an extent as to deprive him of his free agency.

It may be observed that Archibald's account of the transaction of the sale of the soap-house property to him is contradicted in material respects. He says that in March, 1872, the testator offered to sell that property to him, giving, as his reason, that his health was failing; that he accepted the offer and agreed to take the property, and that on the 1st of April he went to see him to get him to fulfill his contract, and he refused, saying that he had got better and had sent for more stock. He says that on the 20th of April the testator sent for him to endorse a note, to be given in renewal of one which he had endorsed for the testator's firm, and which the testator wanted to renew, and he did it for him; that the testator said he was sorry he had not fulfilled his bargain to sell the property to Archibald; that Archibald said it was not too late to do so, and the testator said he would complete the sale that day, and requested Archibald to go to Mr. Moore and get the papers drawn. Now, the evidence is that the note of which Archibald spoke was discounted by the Trenton Banking Company on the 26th of January, 1872, and was payable at four months from its date. It was not due, therefore, until the latter part of May following. Further, Archibald says that when he went to the soap-house on the 20th of April, he got there about two o'clock in the afternoon. Hopping, a witness for the defendant, testifies as to that day. He says the testator was at the soap-house in the morning a little while; that the testator paid him on that day, and that after he had paid him the witness took him down to the soap-house and brought him back again; that the testator was there only a very few minutes; that the witness does not remember that any one else was at the soap-house when he took him down, and that he does not remember that any one came in while he was there. He says the testator was never there afterwards.

The conveyances in question were made under such circumstances that they ought not to be permitted to stand. The

deed to Archibald as to the testator's interest in the property thereby conveyed, and the sale of the testator's interest in the soap-house stock and fixtures and utensils, will be set aside as having been obtained by fraud. So, also, will the deed to Jethro and Ann for the Lamberton street property, in fee simple. Archibald will be required to account to the complainant, Randolph H. Moore, executor, for the half of the rents and profits of the soap-house property, and for half of the personal property just referred to. In the account he will be allowed one-half of the $1500 paid by him, and one-half of all principal and interest, or either of them, which he may have paid on the mortgage for $1500, subject to which the soap-house property was conveyed to him. He will also be allowed one-half of the cost of the improvements put by him on the property—the pavement, flooring, ceiling, stairways, sills, &c.